UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

CLEAMENT FRANCE,

Defendant.

---

17-cr-724 (JSR)

MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.

On March 5, 2024, the Court held a hearing on eleven specifications of violations of supervised release conditions alleged against defendant Cleament France. At the close of the evidence, the Court found that the Government had proven specifications 1, 2, 3, 4, 5, 10, and 11, but requested further briefing on specifications 6, 7, 8, and 9, which stemmed from Mr. France's alleged possession of a firearm on October 5, 2023. See 3/5/24 Hearing Transcript ("Tr.") 141:9-22, 142:11-15, 143:10-16, ECF No. 49.[1] After full consideration of the parties' written submissions and the evidence presented at the hearing, the Court

---

[1] At the hearing, defense counsel did not dispute specifications 1, 2, 3, 4, and 5, which pertain to Mr. France's illegal use of controlled substances and failure to participate in residential substance use treatment. See Tr. 103:15-104:6. On specifications 10 and 11, which allege that Mr. France unlawfully possessed ammunition, the evidence was likewise undisputed. When Mr. France was arrested, the police officers searched his person and recovered a 9mm bullet from his pocket. Tr. 8:15-9:4.

ruled, by "bottom-line" order dated April 15, 2024, that the Government had not proven by a preponderance of the evidence specifications 6, 7, 8, and 9. See 4/15/24 Order, ECF No. 54. This Memorandum Order reconfirms that order and explains the reasons for its ruling.

## I.   Factual Background

On January 17, 2018, Mr. France pled guilty to one count of being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1). See 1/17/18 Tr. 9:15-11:3, ECF No. 10. The Court sentenced Mr. France to 48 months of imprisonment and 3 years of supervised release. Judgment in a Criminal Case, ECF No. 15. Mr. France then commenced his initial term of supervised release on April 15, 2021. On February 17, 2022, Mr. France admitted that he had violated the conditions of his supervised release by failing to report to the probation office, committing the crime of menacing in the 3rd degree, failing to participate in a mental health treatment program, and using a controlled substance. Amended Judgment in a Criminal Case ("Amended Judgment"), ECF No. 37; 2/17/22 Tr. 6:21-7:6, 11:1-13:22, ECF No. 38. For those violations, the Court sentenced Mr. France to 71 days' imprisonment, to be followed by 90 days in a halfway house and a new term of supervised release to terminate on April 14, 2024. See Amended Judgment. The specifications now at issue before the Court arise from an altercation between Mr. France and Brenda Marrero that occurred on

October 5, 2023. The Government alleges that on that day, Mr.
France threatened Ms. Marrero with a firearm and then hid the
firearm at the apartment of Debra Perez.

At the violation of supervised release hearing, two NYPD
officers, Michael Gargallo and Assad Tawil, testified as to what
Ms. Marrero recounted to them about the morning of October 5, 2023.
That day, Ms. Marrero reported that Mr. France threatened her with
a firearm outside of 1228 Union Avenue when she went to retrieve
mail from her son's mailbox, and that as she was driving away from
the scene Mr. France "shot the gun in the air." Tr. 5:5-6:2, 63:23-
64:1.[2] After hearing Ms. Marrero's report, the police drove to
Union Avenue "to do a ballistics search and to see if the person
that committed the crime against [Ms. Marrero] was there." Tr.
6:9-17. When the police arrived, Mr. France was exiting 1223 Union
Avenue, and Ms. Marrero quickly identified him as the perpetrator.
Tr. 6:18-22, 7:16-25, 36:15-17. Officer Gargallo then promptly
arrested Mr. France, and during a search of Mr. France's person,
the police recovered a cellphone, marijuana, and a 9mm bullet with
a red dot on it. Tr. 8:10-9:4. The police did not find a gun during
the search. Tr. 15:7-9. The police then transported Mr. France
back to the precinct, where he called Ms. Perez on speaker phone

_____

[2] At the time of her initial report to the police, Ms. Marrero had
not yet identified the perpetrator as Mr. France; she identified
Mr. France as the perpetrator once she arrived back at the scene
with the police. Tr. 6:18-22, 35:7-8, 68:11-14.

and "told her to tell a friend of his that the bail money was underneath the couch, to get the bail money, and he'll call him when got to bookings." Tr. 16:11-17:8, 65:9-21, 79:5-16.

Later that morning, Officer Gargallo and Detective Xavier Larino returned to 1223 Union Avenue, the building where Ms. Perez lived. Tr. 18:18-19:16, 45:2-6. When the police arrived, Ms. Perez consented to a search of her apartment. GX-17. During that search, the police found a loaded, 9mm ghost gun under a couch cushion, close to the front door of the apartment. Tr. 21:8-24, 58:14-17, 95:18-98:11. When the police found the gun, Ms. Perez exclaimed, "He did stash it in here!" GX-32, GX-33.[3] Ms. Perez later told the police that earlier that morning, she heard a dispute and a "pop" outside. GX-34. Soon thereafter, she opened her front door and saw Mr. France standing in the hallway. Id. Mr. France told her that he had an argument with "Brenda" and that Brenda pulled a knife on him. Id. Upon hearing about the altercation, Ms. Perez ran to the bathroom, but she left the door open to her apartment, while Mr. France was standing in the hallway. Id. Ms. Perez told the police that she never saw Mr. France enter her apartment that morning,

---

[3] The defense argues that this statement should not have been admitted at the hearing as an excited utterance because it rests on speculation. See Def. Opp'n Br., at 12, ECF No. 52 (citing Brown v. Keane, 355 F.3d 82, 90 (2d Cir. 2004)). Defense counsel, however, did not raise this argument at the hearing, and the video recording that captured this statement was admitted into evidence on the consent of the parties. Tr. 107:21-114:14. This objection is thus waived.

that Mr. France does not have a key or general access to her apartment, that only her children live with her in the apartment, and that she leaves her door unlocked when she goes to the store because she is a "local." Tr. 48:17-20; GX-32; GX-34.[4]

## II.  Legal Standard

The specifications at issue here allege that Mr. France violated four provisions of New York State criminal law. Specification 6 alleges that Mr. France violated New York Public Law § 265.03(3), which provides that "[a] person is guilty of criminal possession of a weapon in the second degree when . . . such person possesses any loaded firearm."[5] Specification 7 alleges that Mr. France violated New York Public Law § 265.01-B, which provides that "[a] person is guilty of criminal possession of a firearm when he or she possesses any firearm." Specification 8 alleges that Mr. France violated New York Public Law § 265.02(1), which provides "[a] person is guilty of criminal possession of a weapon in the third degree when . . . [s]uch person commits the

---

[4] The Court admitted all of Ms. Perez's statements for the truth of the matter asserted and only asked for further briefing on the weight that the Court should give to her statements. Tr. 138:7-17. Accordingly, defense counsel's arguments regarding the admissibility of Ms. Perez's statements are misplaced.

[5] The amended violation of supervised release report erroneously labeled this specification as the state crime of "possession of ammunition," but the state law provision that was cited, New York Public Law § 265.03(3), criminalizes the possession of a weapon in the second degree. See Gov't Opening Br., at 2 n.2, ECF No. 51.

crime of criminal possession of a weapon in the fourth degree as defined in subdivision one, two, three or five of section 265.01, and has been previously convicted of any crime." Finally, Specification 9 alleges that Mr. France violated New York Public Law § 265.01(1), which provides "[a] person is guilty of criminal possession of a weapon in the fourth degree when . . . [h]e or she possesses any firearm" unless he or she qualifies for an exemption under New York Public Law § 265.20. The Government bears the burden to prove these specifications by a preponderance of the evidence. See 18 U.S.C. § 3583(e)(3).

## III.   Analysis

Based on the evidence submitted at the hearing, the Government urges that it has proven the firearm-related specifications by a preponderance of the evidence. The Government argues this is so because:

> France was arrested--with a bullet in his pocket, after being
> credibly identified as having just assaulted a woman with a
> gun--walking out of the apartment in which the gun was found.
> Shortly after his arrest, he called his girlfriend, who lived
> in the apartment, and urged her, in coded language, to get
> the gun out from underneath the couch. She did not understand
> what he was saying. Indeed, having no reason to think there
> was a gun in her home, she invited the police inside to look
> for one. They immediately found it, in exactly the location
> France had identified, only steps away from where he had been
> standing that morning, just on the other side of Perez's
> unlocked apartment door. The only reasonable inference from
> the evidence before the Court is that France put it there.

See Gov't Opening Br., at 7-8. However, this theory requires the Court to credit Ms. Marrero's account of the morning of October 5,

2023, when there are numerous reasons to doubt Ms. Marrero's credibility, and to infer that the gun recovered from Ms. Perez's apartment was the gun that Mr. France used to threaten Ms. Marrero, when that theory rests on a series of speculative inferences.

First, the Court finds that the evidence it heard about Ms. Marrero's account of what occurred on the morning of October 5, 2023, is entitled to little weight. The Court heard no live testimony from Ms. Marrero because she refused to testify, despite being subpoenaed, and because the Government declined to seek a bench warrant to compel her testimony, despite the Court's invitation to do so. Tr. 12:10-13:22. In such circumstances, the Court cannot and will not give as much as weight to hearsay statements as it would have given to her live testimony, because her statements were not subjected to cross-examination at the hearing and the Government's decision not to seek a bench warrant deprived the Court of the ability to assess Mr. Marrero's credibility for itself. The fact that hearsay is admissible at supervised release violation hearings does not mean that the Court should give such hearsay meaningful weight when the Government could have readily taken steps to produce the key witness.

Not only did the Court hear no live testimony from the alleged victim in this case, but the Court also heard considerable evidence calling into doubt the veracity of Ms. Marrero's report to the police:

First, both Officer Gargallo and Officer Tawil testified that even though Ms. Marrero was not acting drunk, she may have been intoxicated on the morning of October 5, 2023, based on the alcohol they both smelled on her breath. Tr. 32:6-34:13, 68:15-25, 69:12-20.

Second, Ms. Marrero told Officer Tawil inconsistent accounts about what happened on the morning of October 5, 2023, with respect to the discharge of the firearm. At the time of her initial report at the precinct, Ms. Marrero claimed that Mr. France shot the gun at her, but then when taken to the scene of the alleged crime, she claimed that Mr. France shot the gun into the air. Tr. 73:13-24.

Third, there is no physical evidence that corroborates that Mr. France discharged a firearm.[6] Six officers canvassed the scene and did not find any shell casings, spent bullets, or broken glass indicating that a gun had been fired. Tr. 15:17-16:8, 37:11-38:18, 39:2-40:9, 71:19-73:6. Additionally, ShotSpotter, a technology that the police use to detect shootings, did not detect that a gun had been discharged on the morning of October 5, 2023, even though

---

[6] The Government argues that the fact Mr. France was present at the scene of the alleged crime when the police arrived and that a gun was recovered from the apartment building Mr. France was standing outside of at the time of his arrest are consistent with Ms. Marrero's account. However, for reasons the discussed below, the Government failed to show that the gun recovered from the apartment belonged to Mr. France, and his presence at the scene, from which no physical evidence of a gunshot was recovered, does not show that a firearm was involved in the altercation between Mr. France and Ms. Marrero.

Officer Gargallo testified that it is "most likely" that ShotSpotter would have detected a gunshot if a gun had in fact been discharged near 1228 Union Avenue that morning. Tr. 49:18-52:15. Further still, even though there were multiple cameras in proximity to where the altercation occurred, there is no video surveillance footage showing Mr. France with a gun, let alone firing a gun. Tr. 56:14-57:25, 133:1-17.

Fourth, Ms. Marrero has a motive to falsely accuse Mr. France. Her son had "a constant problem" with Mr. France, and she was "upset" with Mr. France because he kept "fucking with her son's mailbox." Tr. 8:6-7, 70:2-13. This animosity even led Ms. Marrero to yell at and insult Mr. France while he was being detained in a holding cell. Tr. 41:1-9, 78:13-21.

These four factors, taken together, lead the Court to question the veracity of Ms. Marrero's account that Mr. France threatened her with a firearm on the morning of October 5, 2023. The Government's attempts to rehabilitate Ms. Marrero's credibility, by arguing that Ms. Perez's statements to the police corroborate Ms. Marrero's account, do not assuage the Court's concerns. It is true as far as it goes that Ms. Perez told the police that she heard an argument and a "pop" outside, and that shortly thereafter, Mr. France came to her apartment and told her he had gotten into an altercation with Ms. Marrero, during which Ms. Marrero pulled a knife on him. But Ms. Perez never said she heard a gunshot; the

Government simply infers that a "pop" refers to a gunshot. Furthermore, conspicuously absent from Ms. Marrero's account is that she threatened Mr. France with a knife. Accordingly, all that Ms. Perez's statements corroborate is that there was an altercation between Mr. France and Ms. Marrero. Her statements do not corroborate the key fact that the Court must find to rule that Mr. France committed the relevant specifications -- that Mr. France possessed and discharged a firearm during the altercation.

Without Ms. Marrero's statements, the Government's case hinges on whether it proved, through credible evidence, that the gun recovered from Ms. Perez's apartment belonged to Mr. France. The Government's evidence on this score, however, rests on speculation. The Government's first piece of evidence is a phone call that Mr. France made to Ms. Perez from jail, in which he told her there was bail money under the couch. The Government interprets this phone call as Mr. France's coded way of informing Ms. Perez that he stashed his gun under her couch. That is too speculative. Indeed, it is not clear from the evidence before the Court whose couch Mr. France was referencing in the phone call. Additionally, there is nothing so peculiar about Mr. France informing Ms. Perez about the location of bail money, when he presumably would need money to make bail, that the Court must conclude that Mr. France was, in fact, not talking about bail money but about a gun. As the

Court suggested at the hearing, this evidence is thus "of very marginal relevance . . . to this case." Tr. 67:2-4.

The Government's second piece of evidence fares no better. The Government relies upon Ms. Perez's statement to the police that she left her door open, while Mr. France was standing in the hallway, when she went to the bathroom. From this, the Government urges the Court to infer that while Ms. Perez was in the bathroom, Mr. France snuck into the apartment and stashed his gun under her couch cushion. That inference, however, is not supported by the facts before the Court. First, no one, including Ms. Perez, saw Mr. France enter the apartment at all, let alone with a firearm. Tr. 47:8-10, 48:5-7, 132:21-25.[7] This dearth of eyewitness testimony is compounded by the fact that despite the multiple cameras that are present on Union Avenue, there is no video footage of Mr. France entering Ms. Perez's apartment with a firearm. See Tr. 56:14-57:25, 133:1-17. Second, the bullet that the police found in Mr. France's pocket, although capable of being used in the gun recovered from Ms. Perez's apartment, did not match the bullets that were found inside the gun. Tr. 29:19-22, 58:24-59:18. Third, there is no physical evidence connecting Mr. France to the gun, despite efforts to recover fingerprints from the gun. Tr. 85:4-

---

[7] This undisputed fact also means that Ms. Perez's statement that "he did stash it in here," after the gun was discovered, is entitled to almost no weight because she did not see Mr. France put a gun there.

15, 135:6-137:4. Thus, in the absence of eyewitness testimony or physical evidence connecting Mr. France to the gun in Ms. Perez's apartment, it is speculation that Mr. France snuck into Ms. Perez's apartment, while she was in the bathroom, to stash his gun. The Court accordingly finds that there is insufficient evidence in the record to conclude that the gun in Ms. Perez's apartment belonged to Mr. France.

**IV.   Conclusion**

In conclusion, the Government has failed to prove that it is more likely than not that Mr. France possessed a firearm on October 5, 2023. The Court accordingly finds that the Government has not proven specifications 6, 7, 8, and 9.

SO ORDERED.

Dated:     New York, NY

April 17, 2024                       JED S. RAKOFF, U.S.D.J.